[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-12259

_____

D.C. Docket No. 0:13-cr-60240-WPD-1

UNITED STATES OF AMERICA,

Plaintiff -Appellee,

versus

RICHARD ALTOMARE,

Defendant -Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 22, 2016)

Before MARCUS, JORDAN, and WALKER,[*] Circuit Judges.

PER CURIAM:

Richard Altomare appeals his convictions for one count of mail fraud, in violation of 18 U.S.C. § 1341, and three counts of securities fraud, in violation of 15 U.S.C. § 75(j), as well as the 37–month sentence the district court imposed. After a thorough review of the parties' briefs, the record, and with the benefit of oral argument, we affirm Mr. Altomare's convictions and sentence.

## I

In January of 2013 Mr. Altomare was approached by the officers of Sunset Capital Assets to help improve the company. Sunset was a newly acquired entity with a very low profile, and its stock traded at a cheap price and low volume as a penny stock on over-the-counter Pink Sheets. Sunset had recently acquired a company that had a collection of rare stones which it hoped to use to increase its value. In order to do this, Sunset wanted Mr. Altomare to help find investors for the company and to draft press releases about how Sunset was doing.

Mr. Altomare was the former CEO of his own company, Universal Express, which had been shut down by the SEC. He was personally fined millions of dollars. The officers of Sunset, however, were not aware of the full extent of Mr.

---

[*] The Honorable John M. Walker, Jr., United States Circuit Judge for the Second Circuit, sitting by designation.

Altomare's past troubles. At the conclusion of the initial meeting, Mr. Altomare agreed to help draft press releases and to aid in finding investors for Sunset.

Subsequent to his meeting with Sunset, Mr. Altomare met with his old business partner, Robert Weidenbaum. Mr. Altomare and Mr. Weidenbaum had previously worked together at Universal Express, where Mr. Weidenbaum aided Mr. Altomare in artificially inflating the company's stock price over a period of four to five years. That inflation scheme resulted in the SEC proceeding that caused the closure of Universal Express. Mr. Altomare and Mr. Weidenbaum were both banned from trading penny stocks by the SEC civil judgments entered against them.

Mr. Weidenbaum had recently pled guilty in an unrelated case to conspiracy to commit securities fraud, wire fraud, and mail fraud. In the hopes of receiving a more lenient sentence, Mr. Weidenbaum agreed to help the FBI by working as an informant. Mr. Altomare knew of Mr. Weidenbaum's legal troubles, but was unaware of his status as an informant.

The FBI instructed Mr. Weidenbaum to record every interaction he had with potential suspects. With the exception of the initial contact to set up the meeting, Mr. Weidenbaum had a copy of every text message and e-mail between himself and Mr. Altomare, and audio recordings of every phone call and in-person meeting between them.

When the two met, Mr. Altomare initially attempted to sell Mr. Weidenbaum on the idea of loaning Sunset money with the rare stones used as collateral. The conversation eventually turned to the topic of stocks. He talked about increasing the stock trading volume of Sunset. Mr. Altomare told Mr. Weidenbaum that they could likely raise the price of the stock from around 50 cents per share to as high as two dollars per share, and that they could continue to make money by letting the price fall, and raising it up again, and selling the stocks off. During this meeting, Mr. Altomare told Mr. Weidenbaum, "if nothing else, you and I will just pump the shit out of the stock and make money there too." D.E. 89 at 69.

Mr. Altomare wanted to manage a vast majority of Sunset's stock in order to better control how it was selling. Over the next two months Mr. Altomare and Mr. Weidenbaum discussed the manner in which they would inflate Sunset's stock price. Mr. Altomare informed Sunset that he had found a legitimate investor in Mr. Weidenbaum, and he began making arrangements to get shares of stock issued to Mr. Weidenbaum. Mr. Altomare did not provide any information about Mr. Weidenbaum to Sunset, aside from the fact that he was an investor.

Mr. Altomare also arranged for an unknown person in Canada to participate in the "pump and dump" scheme through a buy-ratio agreement. Mr. Altomare was going to pay the Canadian participant one dollar or one share of Sunset stock for

every three shares of Sunset he bought. This would help create the appearance, to an investor, that the stock had liquidity. That, in turn, would make it easier to trade the stock.

Mr. Altomare set up a similar arrangement with Mr. Weidenbaum. He was going to have 70,000 shares issued to Mr. Weidenbaum at a discounted rate of fifty cents per share, which was about half of the market price. In exchange for those 70,000 shares, Mr. Weidenbaum agreed to purchase 140,000 shares. To circumvent Mr. Weidenbaum's penny stock ban, the certificate for the 70,000 shares was issued to Neptune Capital, a company that was controlled (unbeknownst to Mr. Altomare) by the FBI.

Despite Sunset selling shares to Mr. Weidenbaum, there was no plan to legitimately compensate the company for the stock. Ultimately, Mr. Altomare and Mr. Weidenbaum were going to split the profits of the stock dump and have Mr. Altomare pay Sunset with those proceeds. Mr. Altomare instructed Mr. Weidenbaum to pay him his share of the proceeds in the form of a forgivable loan so that he could create a paper trail with respect to his new income. Mr. Altomare again reiterated that he thought the stock price might climb to over two dollars per share, and that it might even go as high as ten dollars, but that even if it did not rise that high, he and Mr. Weidenbaum would make a lot of money selling the inflated stock if they had millions of shares.

The other component of the scheme was to time the stock purchases with press releases. In order to make the increase in trading volume look legitimate, the buying would have to coincide with positive news about Sunset. To maximize the amount of inflation and to make the purchases look legitimate, Mr. Altomare and Mr. Weidenbaum discussed the best time to buy, and whether Mr. Weidenbaum should "prime the pump" and do a small bit of buying before a press release. Mr. Altomare ultimately decided that it would be better to wait until the press releases were issued to the public. Mr. Altomare chose to provide handwritten copies of the releases and their anticipated dates to Mr. Weidenbaum to avoid leaving an electronic paper trail.

While the two men were crafting strategies to artificially inflate Sunset's stock price, Mr. Altomare pressured Mr. Weidenbaum for loans in various amounts. Mr. Altomare intended to take the money Mr. Weidenbaum lent to him and then lend it to Sunset. He wanted to do this in the hopes of making Sunset dependent on him, which he believed would make the company easier for him to control.

Mr. Altomare sent the 70,000 shares for Mr. Weidenbaum to Neptune Capital through Federal Express. At the behest of Mr. Altomare, an account controlled by the FBI, but supposedly belonging to Mr. Weidenbaum, purchased another 2,000 shares of Sunset on the open market. The stock certificate was issued

6

for the 70,000 shares, and Mr. Weidenbaum told Mr. Altomare that he would buy more stock. After another press release was issued, the FBI-controlled account purchased another 3,500 shares. Mr. Altomare repeatedly checked in with Mr. Weidenbaum about what he was doing and whether the stock price had moved.

At one point, at the direction of the FBI, Mr. Weidenbaum cut all contact with Mr. Altomare. Prior to his arrest Mr. Altomare had a meeting with an FBI agent and he denied any wrongdoing.

A jury convicted Mr. Altomare on one count of mail fraud and three counts of securities fraud. The probation officer initially recommended a base offense level of seven; an eight-level enhancement due to an intended loss greater than $70,000 but less than $120,000; a two-level enhancement because the offense involved the violation of a prior judicial order; and another two-level enhancement because the offense involved sophisticated means. The enhancements raised Mr. Altomare's base level offense to 19. Based on an offense level of 19 and a criminal history category of I, the advisory guideline range was 30 to 37 months' imprisonment. The district court sentenced Mr. Altomare to 37 months' imprisonment, at the top end of the advisory range.

## II

Mr. Altomare first argues that the government presented insufficient evidence to convict him of mail and securities fraud. He asserts that the

government piled inference upon inference and that no substantial evidence was offered in connection with the charged crimes. We disagree.

We review the sufficiency of the evidence *de novo*. *See United States v. Pacchioli*, 718 F.3d 1294, 1299 (11th Cir. 2013). We view the evidence in the light most favorable to the verdict and draw all reasonable inferences and credibility choices in the government's favor. *See id*. Credibility determinations are the province of the jury. *United States v. Copeland*, 20 F.3d 412, 413 (11th Cir. 1994). We look only to see if a "reasonable fact-finder could have determined that the evidence proved the defendant's guilt beyond a reasonable doubt." *United States v. Smith*, 459 F.3d 1276, 1286 (11th Cir. 2006).

In order to convict Mr. Altomare of securities fraud under 15 U.S.C. §§ 78j(b) & 78ff(a) and 17 C.F.R. § 240.10b–5, the government was required to prove that Mr. Altomare (1) used a scheme to defraud, (2) in connection with the purchase of a security, (3) that employed the means of interstate commerce or any facility of a national securities exchange; and (4) acted with the purpose of defrauding buyers or sellers of securities. *See* D.E. 91 at 152. *See also Aaron v. Sec. & Exch. Comm'n*, 446 U.S. 680, 691 (1980) (holding that scienter is an element of violations of § 78j and Rule 10b–5).[1]

---

[1] Mr. Altomare does not take issue with the district court's jury instructions.

8

Mr. Altomare maintains that his dealings with Mr. Weidenbaum were designed only to raise money for the company, shrugs off his statements as puffery, and argues that there was insufficient evidence of fraud. The record, however, contains sufficient evidence to sustain Mr. Altomare's convictions for securities fraud.

First, the government presented sufficient evidence for a reasonable jury to conclude that Mr. Altomare employed a scheme to defraud in connection with the purchase of Sunset stock. Mr. Altomare sought out his former business partner, Mr. Weidenbaum, with whom he had previously engaged in a stock manipulation scheme at Universal Express. The most damaging evidence came from Mr. Weidenbaum's testimony and the recordings in which Mr. Altomare explained his scheme to artificially inflate Sunset's stock price. Mr. Altomare spoke repeatedly about how easy it would be to gain control of a vast majority of Sunset's stock and to set up buy-ratio agreements with Mr. Weidenbaum and the participant in Canada in order to help generate volume trading. He strategized about when to distribute press releases to the public and when and how many shares Mr. Weidenbaum should purchase. Mr. Altomare, in his own words, planned to "pump the shit out of the stock and make money."

Second, based on the evidence presented, a reasonable jury could find that, in enacting this scheme, Mr. Altomare employed the means and instrumentalities

9

of interstate commerce. Specifically, the government introduced evidence that Sunset was traded as an over-the-counter Pink Sheet stock and that shares were purchased on a lower-tier national securities exchange as a result of this scheme and at the direction of Mr. Altomare. *See generally Jaffee & Co. v. Sec. & Exch. Comm'n*, 446 F.2d 387, 392 (2d Cir. 1971).

Third, the government presented sufficient evidence for a reasonable jury to find that Mr. Altomare had the intent to commit securities fraud. In addition to the evidence cited above, Mr. Altomare repeatedly and actively disguised the scheme. For example, Mr. Altomare told Mr. Weidenbaum not to buy too many shares too quickly for fear of drawing attention to the artificially increased trading of the stock. He also had the 70,000 shares of stock issued to Neptune Capital due to Mr. Weidenbaum's ban from trading in penny stocks and instructed Mr. Weidenbaum to transfer half of the proceeds to him, but cloaked as a forgivable loan. Mr. Altomare attempted to conceal his own involvement by refusing to e-mail the press releases to Mr. Weidenbaum for fear of leaving a paper trail, and instead providing him with handwritten copies. A reasonable jury could conclude that, had Mr. Altomare indeed acted merely with the intention of raising capital for Sunset, his actions would not have necessitated such a veil of secrecy.

Finally, Mr. Altomare took the witness stand in his own defense and attempted to explain away the incriminating recordings. The jury was free to judge

the credibility of Mr. Altomare, and it chose to reject his testimony. On review, we do not substitute our opinion of the evidence for that of the jury. *See Copeland*, 20 F.3d at 413. *See also United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995) ("[A] statement by a defendant, if disbelieved by the jury, may be considered as *substantive evidence* of the defendant's guilt.") (emphasis in original) (citation omitted). Reviewing the evidence in the light most favorable to sustaining the verdict, we conclude that the government presented sufficient evidence for a reasonable jury to convict Mr. Altomare of the charged offenses.

To the extent Mr. Altomare also challenges the sufficiency of the evidence for his mail fraud conviction, that issue is mentioned only in the opening of his argument section and not subsequently developed. Because Mr. Altomare does not present any argument or authority challenging his mail fraud conviction, this claim is deemed abandoned and we do not address it. *See* Fed. R. App. P. 28(a)(5). *See also Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004).

## III

Mr. Altomare next asserts that his convictions should be reversed because the government constructively amended the indictment, allowing him to be convicted not for committing securities fraud, but for defrauding Sunset of 70,000

11

stock shares. A thorough review of the indictment and the evidence presented at trial, however, demonstrates that Mr. Altomare's assertion lacks merit.

The Fifth Amendment guarantees that a defendant can be convicted only of crimes that are charged in the indictment. *See United States v. Holt*, 777 F.3d 1234, 1261 (11th Cir. 2015) (citing *United States v. Ward*, 486 F.3d 1212, 1226 (11th Cir. 2007)). A constructive amendment occurs "when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment." *See id.* (citing *United States v. Narog*, 372 F.3d 1243, 1247 (11th Cir.2004) (internal quotation marks omitted)). A constructive amendment may occur in one of two ways: (1) by the prosecutor's actions; or (2) through the district court's instructions. *See id.* (citing *United States v. Behety*, 32 F.3d 503, 508–09 (11th Cir. 2014)).

A properly preserved constructive amendment claim presents a constitutional claim that triggers *de novo* review. *See United States v. Williams*, 527 F.3d 1235, 1239 (11th Cir. 2008). An unpreserved constructive amendment claim, however, is reviewed only for plain error. *See United States v. Madden*, 733 F.3d 1314, 1322–23 (11th Cir. 2013). We will reverse a conviction under plain error review only if we find "(1) an error (2) that is plain and (3) that has affected the defendant's substantial rights; and if the first three prongs are satisfied, we may exercise discretion to correct the error if (4) the error seriously affects the fairness,

12

integrity, or public reputation of judicial proceedings." *Id.* at 1322 (citing *United States v. Olano*, 507 U.S. 725, 732 (1993)).

Mr. Altomare raised the constructive amendment claim for the first time in his opening brief. We will therefore review that claim for plain error.

Our review here will not proceed beyond the first step of the plain error analysis—actual error—because there was no error in this case.

Relevant to Mr. Altomare's argument are counts II-IV of the indictment, which alleged that Mr. Altomare

> [d]id knowingly, willfully, and unlawfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly, use and employ manipulative and deceptive devices, contrivances in connection with the purchase and sale of securities, and: (a) employ a device, scheme, and artifice to defraud; (b) make untrue statements of material facts and omit to state material facts necessary to make statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which would operate as a fraud and deceit upon any person, in connection with the purchase and sale of securities.

D.E. 1 at 5–6. Mr. Altomare argues that his indictment was constructively amended through the actions of and evidence presented by the government, which encouraged the jury to convict him on unindicted allegations that he stole stock from Sunset.

In making this argument, Mr. Altomare again attempts to paint a rose-tinged façade over his actions. He downplays the likelihood of success of his alleged

13

"pump and dump" scheme, and argues that because the scheme was unlikely to be successful, the government chose to alter its theory of the case in order to secure a conviction.

The record does not support Mr. Altomare's arguments. The government presented evidence that aligned with the indictment—specifically, that Mr. Altomare devised a scheme to artificially pump up the value of Sunset stock by asserting control over the stock, generating artificial trading volume, and issuing strategic press releases. The bulk of Mr. Weidenbaum's testimony and the recordings included discussions about how Mr. Altomare and Mr. Weidenbaum could obtain a vast majority of Sunset's stock and dump it back into the market after inflating the price. Mr. Altomare's arrangement for ratio-buying with Mr. Weidenbaum and the participant in Canada also supported the government's overall theory that Mr. Altomare attempted to defraud the general investing public. Ratio-buying—with the ultimate goal of inflating Sunset's stock price—simply does not fit into, and would serve no purpose under, the interpretation of the record advanced by Mr. Altomare.

Mr. Altomare highlights portions of the government's trial presentation in which the prosecutor referred to the 70,000 Sunset shares, insisting that Mr. Altomare had to lie, cheat, and deceive in order to obtain them. Although the government did indeed make comments about Mr. Altomare stealing 70,000 shares

14

and betraying the people at Sunset, that theft was intrinsic to the offense, so comments and evidence to that effect were presented as part of the overarching scheme to artificially inflate Sunset's stock price for the purpose of dumping—which amounted to securities fraud.

## IV

We now turn to the district court's decision to apply an eight-level enhancement based on an amount of loss of over $70,000. Mr. Altomare argues that there was no actual or intended loss in this case and that the district court's calculation of intended loss is speculative. We again disagree.

"The district court's interpretation of the Sentencing Guidelines is a question of law which we review *de novo*." *United States v. Toussaint*, 84 F.3d 1406, 1407 (11th Cir. 1996) (citation omitted). We review a district court's calculation of loss for clear error. *See United States v. Barrington*, 648 F.3d 1178, 1197 (11th Cir. 2011). There is no requirement that loss be determined precisely—the district court need only make a reasonable estimate of the loss based upon the available information. *See id*. In making its factual findings as to loss, the district court may take into consideration evidence presented during trial, undisputed statements in the presentence investigation report, or evidence presented during the sentencing hearing. *See United States v. Bradley*, 644 F.3d 1213, 1290 (11th Cir. 2011). The

15

district court, however, is not permitted to "speculate about the existence of a fact that would result in a higher sentence." *Barrington*, 648 F.3d at 1197.

The district court applied an eight-level enhancement under U.S.S.G. § 2B1.1(b)(1)(E) for actual or intended loss that is more than $70,000 but less than $120,000. "Actual loss" is defined as the "reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1(b)(1), comment. (n. 3(A)(i)). "Intended loss," on the other hand, is defined as the "pecuniary harm that the defendant purposely sought to inflict . . . and includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation . . . )." *Id.*, comment. (n. 3(A)(ii)). In fraud cases, there is no error in applying an enhancement based upon intended loss even when no actual loss occurs. *See United States v. Menichino*, 989 F.2d 438, 442 (11th Cir. 1993).

We find no error in the district court's application of an eight-level enhancement based upon an intended loss of approximately $75,650 as a result of Mr. Altomare's "pump and dump" scheme. During the sentencing hearing, the district court determined that Mr. Altomare and Mr. Weidenbaum controlled 75,560 shares of stock. It also found that Mr. Altomare intended to inflate the stock price from approximately $1 per share to at least $2 per share—a total increase of

$1 per share. The court then multiplied the two figures, resulting in an intended gain of $75,650.[2]

The methodology employed by the district court in this case is virtually identical to the methodology approved by the Second Circuit in *United States v. Reifler*, 446 F.3d 65, 108 (2d Cir. 2006). The defendants in *Reifler* participated in a "pump and dump" scheme, planning to dump one and one-half to two million shares of stock into the market after raising the price from about five dollars to ten dollars per share. *Id.* at 71–82, 109. Similar to Mr. Altomare, the defendants in *Reifler* were the unwitting targets of an investigation by the FBI, and were arrested before they could completely execute the pump and dump scheme. *See id.* at 108.

The Second Circuit held that, despite ultimately being unsuccessful in the execution of the scheme, the conspirators, by attempting to artificially raise the price of the stock, intended that the shareholders would suffer some amount of loss, *i.e.* "the inflated price paid minus the unmanipulated market value of the shares." *Id.* at 109. The Court concluded it was therefore not an unreasonable interpretation of the guidelines' loss provision to find that the defendants were responsible for more than $5 million in intended loss. *See id.*

The district court applied the same line of reasoning in this case. Because there was no actual loss, the court looked instead to what Mr. Altomare stood to

---

[2] The district court discounted Mr. Altomare's stated ambition of controlling one million shares and inflating the price as high as $10 per share when calculating the intended loss.

gain from the failed scheme in order to determine the amount of financial loss he intended to cause. We find *Reifler* persuasive, and conclude that the district court did not err in its calculation of loss.

## V

Mr. Altomare also contends that the district court erred in applying a two-level enhancement for a crime involving sophisticated means. We are not persuaded.

We review a district court's finding that a defendant used sophisticated means for clear error. *United States v. Ghertler*, 605 F.3d 1256, 1267 (11th Cir. 2010). A finding of fact is clearly erroneous when we are "left with the definite and firm conviction that a mistake has been committed." *United States v. Robertson*, 493 F.3d 1322, 1330 (11th Cir. 2007) (quotation omitted).

The guidelines provide a two-level enhancement if the offense conduct involved a "sophisticated means." U.S.S.G. § 2B1.1(b)(10)(C). "Sophisticated means" refers to "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense," and ordinarily includes "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." *Id*. § 2B1.1, comment. (n.9(B)). When analyzing the applicability of this enhancement, we

18

focus on the offense as a whole, and not on each individual step. *See Barrington*, 648 F.3d at 1199.

Mr. Altomare's plan can only be described as complex. He took several steps to conceal his true motives from Sunset and to ultimately attempt to trick the public into buying stock at an inflated price. He lied to Sunset concerning the investors he had interested in the company and concealed the fact that his "investor" had been barred from trading penny stocks. Mr. Altomare arranged for buy-ratio agreements with at least two individuals in order to artificially increase the trading volume. He attempted to time the ratio buying with the press releases he gave to Mr. Weidenbaum. He provided Mr. Weidenbaum handwritten copies of the schedule and releases so as not to create a paper trail. He also hatched the idea of creating a forgivable loan to disguise the proceeds from his deal with Mr. Weidenbaum. On this record, the district court did not clearly err in applying the two-level enhancement for sophisticated means to Mr. Altomare's base offense level.

## VI

Upon review of the record and consideration of the parties' briefs, we affirm Mr. Altomare's convictions and sentence.

**AFFIRMED**.

19