# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

PAUL MICHAEL JONES,

       Defendant-Appellant.

UNPUBLISHED
February 9, 2017

No. 328816
Newaygo Circuit Court
LC No. 14-010873-FC

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

MATTHEW WAYNE JONES,

       Defendant-Appellant.

No. 328901
Newaygo Circuit Court
LC No. 14-010877-FC

Before: WILDER, P.J., and MURPHY and O'BRIEN, JJ.

PER CURIAM.

Defendant brothers Paul Michael Jones (Paul) and Matthew Wayne Jones (Matthew) appeal as of right from their jury trial convictions, which were entered following a consolidated trial before dual juries. Both defendants were charged with first-degree murder, MCL 750.316(1). Paul was acquitted of first-degree murder and instead convicted of the lesser included offense of second-degree murder, MCL 750.317, for which he was sentenced to 30 to 75 years. On the other hand, Matthew was convicted of first-degree murder and sentenced to life without the possibility of parole. With regard to both brothers, we affirm.

## I. FACTUAL BACKGROUND

This case arises out of the July 1989 disappearance of 18-year-old Shannon Siders (the victim). Her mutilated, decomposing body was discovered by a hunter in the Manistee National Forest near Newaygo, Michigan, several months after she disappeared. Both defendants were teenagers at the time of the victim's disappearance. The prosecution's theory of the case was

-1-

that after driving around "partying" with the victim and several other teenagers and young adults over the course of the night, defendants drove the victim to a secluded location, sought sexual favors from her, became enraged when she declined their advances and fled, hit the fleeing victim with defendant Paul's car, took turns raping and beating her, and eventually beat her to death.

The victim's parents divorced when she way five years old, after which she lived exclusively with her father, Robert Siders (the father), in Newaygo. At the time of the victim's disappearance, Carol Glassner was 17 years old, was dating defendant Paul, and was a close friend of the victim. While partying with Glassner, defendant Paul would consume alcohol, smoke marijuana, and use "acid" (presumably lysergic acid diethylamide (LSD)). On the day the victim disappeared, Glassner, Paul, and the victim had been "hanging out" at a nearby river, swimming. Sometime before the victim's father left for work that night, Glassner and Paul dropped the victim off at home. Shortly thereafter, the victim called Glassner and asked for a ride to "a party." Glassner was babysitting that evening and so was unable to give the victim a ride. In Glassner's presence, Paul also spoke with the victim by telephone. Overhearing Paul's side of the conversation, Glassner heard him refuse to give the victim a ride. Paul left Glassner's house roughly 30 to 45 minutes later, telling Glassner that he was headed home.

As memorialized by a telephone bill that was introduced at trial, the victim's boyfriend, who had recently moved to Ohio for work, called her from a motel near Cincinnati at 9:55 p.m. on the evening that she disappeared. Everything seemed normal during the conversation. The victim told her boyfriend she was planning to go out later that night with, among other people, defendant Paul. Her father left for his midnight factory shift around 10:15 p.m. or 10:30 p.m. He never saw the victim alive again.

Several witnesses gave largely consistent testimony about what the victim was doing in the hours leading up to her disappearance. The majority of the witnesses were intoxicated on the evening in question. Around twilight, a group of teenagers and young adults—including the victim, defendants, Darrin Sackett, Norman Shields, William Shields, Ricky Gomez, Clint Guthrie, and Michelle "Shelley" Burns—all met at the Newaygo "EZ Mart," where they remained for roughly half an hour or 45 minutes. Around 11:30 p.m., the group left, traveling in Paul's car, Guthrie's black Ford Mustang, and William Shields's black Chevrolet Monza. Paul drove a red, 1990 Mercury Cougar with "a white vinyl landau top[.]" The victim rode with defendants in Paul's Cougar. The drivers engaged in "a cat-and-mouse game . . . chasing each other around the back roads of Newaygo County until [they] ended up" at a gas station in Grant, sometime around 2:00 a.m. The group remained at the gas station for approximately 15 or 20 minutes conversing, smoking cigarettes, and discussing their plans for "the rest of the night," and then departed in the same vehicles in which they had arrived. Sackett rode in the front passenger seat of William Shields's Monza, while the victim rode in the front seat of Paul's Cougar, seated between defendants in the front seat. The vehicles headed north on M-37 toward Newaygo, with Paul's Cougar following immediately behind the Monza. Sackett "kept looking behind . . . to see where everybody was going." He was "90 percent" certain that he observed Paul's Cougar turn right off of M-37 onto Hess Lake Road (also known as 88th Street), heading east. Sackett never saw the victim again.

The other vehicles in the group continued north on M-37, eventually pulling into a grocery store parking lot in Newaygo, which was situated at the corner of M-37 and M-82. "Roughly two hours" later, defendants pulled into the grocery store parking lot from the northbound lane of M-37. The victim was no longer with defendants. When asked where the victim was, defendant Paul replied, "We dropped her off at home." Defendants seemed "normal," appeared to be "calm," and the group remained in the parking lot for about another hour, drinking beer and making plans about what to do next. Defendant Paul was wearing the same clothes he had worn on the previous evening. Those clothes showed no rips or evidence that Paul had been in a struggle. When Guthrie's Mustang drove by, defendants left in pursuit. About 20 minutes later, defendants returned to the grocery store parking lot. Around first light—5:00 a.m. or 6:00 a.m.—defendants, Sackett, and William Shields all left, driving to Hess Lake's public access point. On the drive, defendant Paul began to tailgate and William Shields slammed on his brakes, which resulted in a read-end collision. The accident caused "pretty extensive front-end damage" to Paul's Cougar. After the accident, Sackett and William Shields traveled to a local canoe rental business along the Muskegon River, where they were joined by defendants, and drank some more beer. Sackett eventually left with defendants in Paul's Cougar. He sat in the backseat and noticed nothing out of the ordinary in the vehicle.

Dean Robinson, who was incarcerated at the time of trial,[1] was 19 years old at the time of the victim's disappearance. At that time, Robinson was in an "on-and-off-again" dating relationship with Tanya Berends. The night that the victim disappeared, Robinson had plans to meet up with Berends after work, and he hoped to find some "buddies to see if they wanted to go out drinking." While at a gas station, Robinson was approached by a younger local girl he knew, Jenni Corrigan, who was 14 years old at the time. Corrigan got into Robinson's car and told him "she was going to go running with [him] that night." Robinson decided to let Corrigan "tag along" with him. After leaving the gas station with Corrigan, Robinson met a local man from whom he purchased "a whole half a gallon" of whiskey, one "hit" of LSD, and "a quarter gram of cocaine." Robinson took the LSD just before dark and started drinking. He was unsure whether he used any cocaine that evening. Robinson was accustomed to alcohol and drug use and had, at the time in question, already been in a "28-day rehab" program for alcohol abuse. While he admitted that he was "lit up" that night, and that "some of the details" about the evening "are foggy," he testified that his intoxication did not prevent him from perceiving the events of the evening or recalling those events.

After obtaining drugs and alcohol, Robinson and Corrigan began to drive around on the "two tracks" (i.e., the beaten paths created by automobile traffic) in the area near where the victim's body was ultimately found, looking for parties and for Berends. Robinson and Corrigan came across several groups of people but were unsuccessful at locating Berends or any of Robinson's friends. Because of Corrigan's young age, Robinson did not want anyone—particularly Berends—to see Corrigan driving around with him. At some point "way late" in the

---

[1] At the time of trial, Robinson had served "a little bit" more than 12 years in prison for convictions of attempted murder, first-degree home invasion, solicitation to commit perjury, and witness bribery.

evening, the bumper of Robinson's vehicle got "hung up on a stump" and "it pulled off one whole side of the bumper to where it hung down on the ground." After reattaching the bumper, Robinson parked on a "two track," where he and Corrigan talked and waited for the sun to rise.

Around 4:00 a.m. or 5:00 a.m.,[2] a "darker-colored car," which Robinson thought was maroon, approached and parked so that its headlights shone at the driver's door of Robinson's vehicle. Robinson could not recall whether the car had any white trim. Two men were in the car. The driver exited the vehicle, identified himself as "Paul Jones," and said he was looking for "[a] girl walking around out there." The driver was visibly intoxicated and kept trying to look into Robinson's vehicle to see Robinson's passenger.

Eventually, the maroon car and its occupants departed. Thereafter, Robinson and Corrigan stayed where they had been, waiting for sunrise and for Robinson to sober. Because of the damage to his bumper, Robinson was particularly worried about driving under the influence. He believed that the damaged bumper might prompt the police to pull him over and investigate. After about half an hour, Robinson and Corrigan departed. As Robinson was "pulling out of there," he encountered the same maroon car he had seen before. He stopped about 20 to 30 yards from the maroon car. Robinson saw two men, one of whom was the driver he had spoken with earlier that evening. A motionless girl was sprawled on the ground near the driver's side of the maroon car. She appeared to be roughly the same age as Robinson. Because he could see her bare legs, Robinson thought the girl was wearing a dress. From the way the men were acting, the fact that the girl had blood on her face,[3] and the position of her body, Robinson thought that there had been a pedestrian accident. After instructing Corrigan to stay in the vehicle, Robinson "jumped out of [his] car and [] went running" toward the accident, but he "tripped and fell and went skidding," falling to his hands and knees. Robinson's sudden arrival seemed to startle the driver, who turned and abruptly kicked Robinson in the head, splitting his right eyebrow. Robinson "rolled backwards and then went back pedaling toward [his] car[.]" As he did so, the unidentified man who was with the driver walked around the maroon car, wielding something that looked "like a hammer," a "little hatchet like thing," or some sort of hammer-like "roofing tool[.]" As Robinson fled back to his car, Corrigan sounded a continuous blast of its horn. Robinson got back into his car and saw one of the men grab the motionless girl by her arms and drag her "towards the car," but he did not see whether she was placed in the maroon car.[4] The maroon car began to back away, kicking up dust in its wake. Corrigan was "uncontrollable." She "was losing her mind, screaming, crying." Robinson told Corrigan to "get a grip" and told her that the men were only taking the girl to the hospital.

After the second encounter with the maroon car, Robinson drove Corrigan back to town and dropped her off a short walk from her home. He "was really very firm with her," instructing

---

[2] Robinson admitted that he could not remember the time with any certainty.

[3] In a prior sworn statement, Robinson acknowledged that "half the time" he believes the victim did *not* have any blood on her face.

[4] Likewise, Corrigan testified that she did not see whether the motionless girl was placed into the car, but she assumed so after the man dragged the victim to the rear of the car.

her not to tell anyone about what she had seen that night. Robinson explained, "I didn't want to call the law and have to explain myself being drunk, possibly with drugs and a 14-year-old girl in my car." He also wanted to prevent his girlfriend, Berends, from learning that he had been out with Corrigan. Finally, Robinson thought that the motionless girl's injuries had probably arisen out of a drunk driving incident, and he sympathized with the driver. Robinson believed that, had he struck a pedestrian while intoxicated, he might have acted the same way. Robinson's eyebrow was bleeding badly, so he went to his sister's house, where he used superglue to close the wound.[5] Over the intervening years between the incident and trial, Robinson repeatedly told Corrigan to remain silent.

Corrigan's testimony regarding the evening of the victim's disappearance was, with the following exceptions, consistent with Robinson's testimony: (1) Corrigan estimated that it was "probably a couple of hours" between her and Robinson's first encounter with the maroon car and the second encounter, (2) Corrigan did not hear the driver introduce himself as "Paul Jones" but heard him give the surname "Jones," (3) Corrigan was certain she saw blood on the motionless girl's face, (3) Corrigan saw only one man—the driver—during the second encounter, (4) Corrigan confirmed that Robinson "wanted a lot" in exchange for his testimony in this case, and that she tried to influence the authorities to reward Robinson for his testimony, (5) Corrigan testified that, unlike Robinson, she was not under the influence of any intoxicants on the evening in question, and (6) Corrigan initially told the police that the "key players" in the victim's murder were Tony Hastings, Sam Hastings, Sr., Norman Shields, and William Shields.

When asked why she never told anyone about the maroon car incident until recently, Corrigan gave several reasons. First, she thought that the motionless girl had been injured in an accident and believed Robinson when he said that the driver would take the girl to the hospital. Second, Corrigan was afraid of disobeying Robinson's order to remain silent, and she thought he could get into trouble for being out with her that evening. Robinson was older, "very intimidating," and "can be a very threatening person." Third, Corrigan never associated the victim's disappearance—or her discovery in the Manistee National Forest—with the motionless girl she had seen by the maroon car. Corrigan did not realize that the land around Newaygo is part of the Manistee National Forest, instead believing that forest was located *solely* in Manistee, Michigan.

The morning after the victim was last seen with defendants, her father arrived home around 10:30 a.m. or 11:00 a.m. and discovered that the victim was not home. Nothing was missing from the house, nor were there any signs of a struggle. The father was somewhat surprised and angered by the victim's unexpected absence, but he was not overly concerned; he assumed that she had spent the night at a girlfriend's house. Without success, he called several of the victim's friends and inquired about her whereabouts, and he asked neighbors whether they had seen the victim. By that evening, when the father left for work again, the victim had yet to

---

[5] Robinson's sister testified that she remembered Robinson showing up at her house early one morning in July 1989 with a gash over his eye.

return home, and she was not home when he returned the following morning. Several days after she disappeared, the victim's father reported her as missing.

At the time of the victim's disappearance, Officer Paul Jay DeWispelaere of the Newaygo Police Department served as a school-police liaison between the local prosecutor's office and the local schools. The day after the victim disappeared, Officer DeWispelaere was asked by the Michigan State Police to examine defendant Paul's vehicle for damage regarding Paul's accident with William Shields. Paul cooperated with the traffic investigation, admitted his involvement, and did not, during his July 19, 1989 interview, appear "unusually anxious or nervous[.]" In a later interview, Paul admitted that on the night of her disappearance the victim had been "doing a lot of riding around" with him in his vehicle, but he claimed to have taken her home "after midnight." Paul told Officer DeWispelaere that, after taking the victim home, "[h]e went to Clint Guthrie's house[and] spent the night." Officer DeWispelaere also interviewed defendant Matthew, who told DeWispelaere that defendants had taken the victim home, dropping her off around 2:00 a.m., and thereafter defendants had continued to drive around partying.

During their investigation, the police interviewed several people who acknowledged that they were with the victim on the evening she disappeared: defendants, brothers Norman and William Shields, Gomez, Guthrie, and Burns. During the roughly 476 witness interviews that Michigan State Police (MSP) Detective Richard Miller conducted in this case, however, no one ever reported seeing the victim alive after she was last seen with defendants.

"[J]ust a couple of days" after the victim disappeared, Elizabeth Brooks (one of Paul's girlfriends at the time of the victim's disappearance) spoke with Paul about the fact that the victim was missing, and Paul said, "Just face it, she's dead." Paul gave Brooks several differing explanations for how he damaged his car, none of which involved the car accident involving William Shields:

> He [] said that he had gotten in a confrontation in Newaygo at a party and people took a baseball bat to his car. Then looking at his car, [Brooks] said: That's not [damage from] a baseball bat. And then [Paul] said that he hit a deer, hit a tree. And [Brooks] told him he was lying, and he [] later said: Maybe I ran Shannon [the victim] down with it.

Janet Weston was 17 years old at the time the victim disappeared. Weston testified to certain statements made by each defendant—in the presence of the other defendant—after the victim disappeared. The statements in question were made to defendant Matthew's girlfriend, Teri Lucas. Matthew informed Lucas that detectives would "probably" be coming to speak to her about the victim's disappearance. When asked why the detectives would do so, Matthew responded, "Because [we] were all at a party together, which was the last place [the victim] was seen with [us]." "Paul said that they dropped her off a ways from her home" after the party, explaining that defendants wanted to avoid any contact with the victim's father while dropping her off. During this conversation, neither defendant corrected the other or objected to the truthfulness of the other's statement.

During Labor Day weekend of 1989, the victim's photo identification card was discovered in the Manistee National Forest. A gas card bearing the victim's father's name was

also discovered nearby. On September 5, 1989, MSP Trooper Russell Moulton investigated the fire pit area near where the gas card was discovered. Roughly 10 to 15 feet away from the fire pit, Trooper Moulton discovered a pair of mens Levi's jeans, a beach towel, and a pair of olive drab "army pants" that might have been worn by a male or a female. The pants were never identified as the victim's, nor were any pants belonging to the victim ever located.

Several months after the victim's disappearance, a man hunting deer near a location that some locals refer to as "The Hole in the Woods" or "The Pothole" discovered the victim's remains. The nearest major intersection was M-82 and Thornapple Avenue. The hunter promptly informed the Michigan State Police of his discovery. An investigating officer testified that the victim's body was situated behind some pine trees in such a way that it was very difficult to observe. The victim was wearing a garment that had "characteristics" of either a sweater or a dress. Her right hand was "clasping a beaded necklace," which matched a description of one of the victim's necklaces. Her eyes had been blackened before she died, her hands were bruised, and one of her shoulder blades was fractured, as were one of her "nasal bones," two ribs, and one of her lumbar vertebrae. The victim's skull was detached from her neck, found 14 feet from her body. A portion of the back of the skull was missing. Several pieces of the missing portion of the skull were found, but others were never located. An expert forensic anthropologist testified that the fractures of the victim's skull were indicative of multiple blunt force injuries to the back and sides of her head.

Because of the passage of time and decay, ordinary signs of sexual assault, such as the presence of semen, could not be relied upon. But the victim's sweater and bra were hiked up "around her shoulder or neck area," revealing her upper torso and breasts, and her panties were pulled down such that they had been removed from her right leg entirely and were secured only to her lower left leg. Also, the victim was in a "supine position," i.e., lying on her back, and her legs were spread apart. The victim's left breast was severely bruised: "[i]t must have been really beaten and just bled terribly inside." Some amount of tissue from the victim's pubic region had been removed after her death. After the victim died, incisions had been made around her genitals with a very sharp knife. Because of the advanced decay, the medical examiner was unable to determine "how far down the cuts went." But it appeared that the area had been "incised and then undermined . . . and pulled away and cut off[.]" A "lock blade pocket knife" was discovered near the victim's remains, as was a pair of table legs. Based on his investigation, Detective Miller believed that the victim died on the night that she disappeared.

In a written statement he provided to the police, Matthew claimed that, after leaving Grant, defendants "dropped [the victim] off and rode around some more." While discussing his statement with Detective Miller, Matthew expounded on what defendants did after leaving Grant:

> He [Matthew] was still with [the victim] and his brother and they drove northwards to Newaygo. . . . [H]e had conversations with [the victim] and she expressed a desire to have them stop at the [] Gas Station again. They did, and she went inside and bought a piece of pizza. She apparently consumed the pizza. . . . And she lived about a block from that location, and he told me they initially planned to drink a few beers with her at her house but, when they got there, she

excused herself saying she was tired and wanted to go to bed, so they dropped her
off and watched her approach the door of the house and they . . . drove away.

Matthew said he saw the victim's dog in the window while defendants were dropping her off at home.

Amy Bonnor performed an independent investigation into the victim's murder. At one point the local sheriff told Bonnor that he could charge her with acting as a private investigator without a license if she continued investigating the victim's murder, after which Bonnor "slowed down" considerably. But the sheriff did not believe that Bonnor's investigation interfered with the police investigation. Quite the contrary, Bonnor provided the police with "a lot of helpful tips."

Several witnesses testified to admissions made by defendants after the victim's remains were discovered. Defendants' half-brother initially told the police that on several occasions Matthew had told him he last saw the victim when she "got into a car full of Mexicans." But when the half-brother informed Matthew that he had told the police about the "car full of Mexicans," Matthew replied, "that's not what I told you."

While talking with Danny Proctor alone at Matthew's house several months after the victim disappeared, Paul said "that he was the last one seen watching his brother [Matthew] walk into the woods with [the victim] in a row of trees." Paul said defendants' last "contact" with the victim was "partying" in the woods at "The Pit." Paul also "sa[id] . . . he don't have nothin' to worry about," "said the cops don't have nothin' on him," and denied that he or Matthew were involved in the victim's death.

Several month after the victim's remains were discovered, Randy Kosheba was exiting a gas station and heard defendant Paul say, "[T]he bitch got what she deserved[.]" Kosheba did not hear the rest of the conversation.

"At least a couple months" after the victim disappeared, Glassner encountered Paul by chance while visiting a mutual acquaintance's house. Glassner asked Paul whether, on the evening of the victim's disappearance, he actually went home after leaving Glassner's house or did something else. Paul replied that he had, in fact, gone home after leaving Glassner's house. Because she did not believe him, Glassner pressed the issue. Paul then changed his answer, telling Glassner "[h]e didn't know what he did" after he left her house on the evening in question.

Melissa Forist was friends with the victim. On one occasion at a party in the woods, Forist—who had been drinking—began to speak loudly, hoping that defendant Matthew would overhear her, and said, "[H]e should be in jail for being involved with what happened to" the victim. Matthew made no response, but he gave Forist "a dirty look."

Todd Bull grew up with defendant Matthew. While smoking marijuana at a bachelor party several years after the victim's murder, Bull saw Matthew grab a woman by the throat and threaten to "put her in the ground like the . . . fucking cunt up north."

Tammy Welch grew up with defendant Paul, considered him to be one of her good friends, and "always partied" with him. Paul told Welch that the victim was with defendants on the night she disappeared, and defendants were "pretty intoxicated" that evening, "but they dropped [the victim] off at home and her dad was very upset." Paul also told Welch that, at the time she was dropped off at home, the victim "said she was going to get her bathing suit on or something and go to the river." Welch was also very close to defendant Matthew. Sometime after the victim's remains were found, Matthew asked Welch what she would think if he was the victim's killer.

At a party the year after the victim's remains were found, Brooks saw defendant Paul and "some others . . . running around chanting" lyrics to the "Guns N Roses" song "Used to Love Her." Paul and the others changed the lyrics of the song to "should have buried her six feet under and he never would have found her."

Also about a year after the victim was murdered, Bernadette Clark was at a party in the woods with between 20 and 40 partygoers. Defendants were standing roughly 20 or 25 feet away from Clark, who had consumed "one or two drinks" that evening. Defendants had been drinking. While talking about the victim in a "bragging" and "cocky" manner, defendants spoke "about how they had had them already, they couldn't pin it on them, [and] they were free and clear." Defendants also said, "they can't pin it on us. They had us, [and] they let us go." "Two to three months" later, while attending a birthday party at Clark's house along with 30 to 40 other guests, Clark overheard defendants conversing about the victim in front of Guthrie and several others. Defendants were standing by a fire pit in a group of 5 to 8 people, roughly 20 to 25 feet away from Clark. There was no music. Clark heard both defendants say, "They had us once, they let us go, [and] we're free and clear." Then defendant Paul said

> that they had taken her [the victim] out to a party spot. She discovered there was nobody out there, so she got out of the vehicle and started to leave. He said that they chased her with the car, hit her, [and] knocked her down with the mirror of the car. And then they got out of the vehicle and they grabbed something from behind the vehicle, a log or something, and they started to hit her with it, and they took turns having sex with her.

Matthew was "[r]ight next to" Paul when Paul made such comments. Matthew did not say much during the conversation, but he nodded his head, and said "yes and uh-huh." Matthew did not dispute the truth of what Paul said in any way. During the conversation, both defendants again acted "cocky," as if they were "bragging."

Eve Rakowski formerly dated defendant Paul and has a child with him. While speaking with Rakowski about the victim's murder sometime in 2003 or 2004, defendant Matthew said that when defendants dropped the victim off at home, "the lights were on, and that [the victim] made a comment in effect . . . that: Oh man, my dad's home. He's going to be upset. I'm out too late." Matthew also told Rakowski that he was driving and that Paul was "passed out" at that time.

About 10 to 12 years before trial, Gregory Fox was "partying"—consuming alcohol and smoking marijuana—with defendant Paul and several others at the home of a mutual friend when

the subject of the victim's death arose. Paul said "[s]omething like: Only the people that was there will know the truth of what happened to her." Later in the conversation, while "talking about a house on Hess Lake," Paul said "that people wouldn't know, besides the people that was there, what happened in the house in the basement and the rape that was going on." On another occasion (Fox could not recall the date), Jones said that the victim's body had been "in a house and tied up" and was "dumped in the woods." At the time the comments were made, it was common knowledge in the community that the victim's body had been found in the woods and there were rumors that the victim had been sexually assaulted, but Fox had the "impression" that Paul's statements were based on personal knowledge, not news reports or rumors. Fox did not report Paul's comments to the police because he thought such comments were "just hearsay." Ultimately, the original investigation into the victim's murder stalled. But in 2011, a "cold case team" was formed to investigate the murder anew. Roughly 300 people were interviewed, and the cold case team uncovered numerous witnesses that were never interviewed as part of the original investigation into the victim's disappearance and death.

Angela Chase met defendant Paul in 2010. While Chase was giving Paul and a friend a ride to a nearby town, Chase turned the conversation to the topic of the victim's exhumation, saying, "So, well, what do you guys think about the news? . . . . Bobby Siders [the victim's father] has a special pair of handcuffs for whoever killed his daughter and they also have an anthropology guy that could get some DNA off of her body." Paul responded, "Well, they have mine DNA [sic], but they don't have my brother's." His tone was "mean," and his demeanor was "highly agitated and defensive." Paul's response frightened Chase.

Eddie Jackson was a jailhouse informant who was incarcerated with defendant Paul for roughly five or six months before trial.[6] Jackson testified that, on one occasion, Paul said, "I shouldn't have gotten my brother into this shit." Another time, Paul said, "Man, they're not going to find a murder weapon," further suggesting that the police were looking for the wrong type of weapon and that the actual murder weapon had "four prongs and it doesn't match up with any wounds on the [victim's] body[.]"[7] Paul told Jackson that defendants were not guilty of the victim's murder and that, on the evening of her disappearance, defendants dropped her off at home.

Before trial, the prosecution filed a motion in limine seeking to admit the testimony of several witnesses, including Ronald King, regarding various out-of-court statements allegedly made by defendants. The prosecution argued that such statements were admissible against defendants as admissions by a party opponent or adoptive admissions under MRE 801(d)(2). At

---

[6] Jackson was convicted in federal court of three counts of sex trafficking of a minor, for which his minimum sentence was 30 years in federal prison, and he was hoping to receive a reduced sentence in return for his testimony in this case. Jackson did not have a deal "in hand." In other words, the degree to which Jackson's sentence would be reduced—if at all—was contingent on how helpful his testimony was to the prosecution in the instant case.

[7] The victim's body showed "patterned dot bruises" indicative of being struck with something with four tines or prongs. There is a hand-held roofing tool that could have left such bruises.

the final pretrial conference, however, the parties agreed that, rather than ruling on the prosecution's motion before trial, the court would receive an offer of proof during trial regarding the substance of King's testimony. Thus, several days into the trial, and out of the presence of the juries, the trial court received an offer of proof concerning King's testimony. King is a distant blood relative of defendants (defendants' grandfather is King's half-brother), was 70 years old at the time of trial, and has serious memory problems. Defendants would visit King at his home a "couple three or four times a year." "Late in the summer" of 1989—in "September, maybe October"—defendants visited King and, while smoking marijuana together, the three discussed the victim. King could tell that defendants had been drinking before they arrived at his house: "They were having trouble talking, walking, and they were carrying their beer in their hand." King was unable to remember with any specificity which comments were made by Paul and which were made by Matthew:

> *Q*. Do you remember a conversation about [the victim] with Paul and [Matthew] that night?

> *A*. Yes, I remember several things that were mentioned.

> *Q*. Okay. Were both individuals— Was [Matthew] taking part in the conversation?

> *A*. I'm not— Both of them were at one time or another, all of—both of them talked.

> * * *

> *Q*. Okay. Is the conversation going on between the three of you?

> *A*. Not really.

> *Q*. Okay. Tell Judge Monton about that, please.

> *A*. They came over and we were talking about different subjects. And when the subject of [the victim] came up, one would say something and the other one would tell him to be quiet. It seemed that one of them was talking and the other one was the quiet side. I mean, they were telling to be quiet [sic], or we don't have to discuss that, or they'd look over at me and just not say anything.

> *Q*. Okay. Could they both hear each other speaking at the time?

> * * *

> *A*. Yes. They were at the same table.

> *Q*. Okay. Did it appear to you that they were both participating between each other in this conversation about [the victim]?

> *A*. Yes.

-11-

*Q.* Okay. Meaning that you don't remember specifically who said what during any of this conversation?

*A.* Exactly.

* * *

*Q.* All right. So now as you sit here today, if you were going to testify, you can't say who said what during this conversation, can you?

*A.* No. I don't know which one is Paul and which one is Matthew right off the top of my head today.

Upon further questioning, King explained,

I don't— I don't have a good timeline in my brain, so I might say yes where I should have said no in the first place. In other words, I get things turned around a little bit.

But that night, one of them said: Maybe we shouldn't have hit her so hard. One of them said maybe—something like: She should have give [sic] us what we wanted. One of them said— I can't remember.

* * *

I told the police that one of them said something [as defendants were leaving King's house], and right now I cannot remember what it was. And the other one says: Well, we don't have to talk about that now. I think we're in the clear. . . . Something to that effect.

* * *

I don't care how many times you ask me, I can't answer yes or no to some questions. . . . [I]f I can't remember . . . I'm sorry.

When asked what response was made to the comment that the victim should have given defendants what they wanted, King replied, "I'm not sure there was an immediate response." King acknowledged that he was sitting across a table from defendants and was unable to hear "a lot" of the conversation between the two. The day after he overheard the comments, King called the police to report the conversation, but he testified that he never received a response from the authorities.

Following the offer of proof, the prosecution sought to admit King's testimony regarding the admissions defendants made to him. The prosecution first argued that the statements in question did not qualify as hearsay because they were not being offered to prove the truth of the matter asserted. Alternatively, the prosecution again argued that the statements were admissible

against defendants as either admissions by a party opponent or adoptive admissions. Conversely, defendants argued that (1) the statements in question were inadmissible hearsay, (2) the prosecution had failed to lay a proper foundation regarding which statements were made by which defendant, (3) given King's memory problems, it was impossible to lay a proper foundation that either defendant acquiesced to the truthfulness of the statements, and (4) if otherwise admissible, the statements should be excluded as more unfairly prejudicial than probative under MRE 403. After considering the matter, the trial court agreed with defendants and held that King's testimony was hearsay and was inadmissible under the theories advanced by the prosecution. After the prosecution pursued an emergency interlocutory appeal, however, this Court peremptorily reversed the trial court.[8]

Hence, the trial court was ordered to admit King's contested testimony, and it did so. King's testimony at trial was largely consistent with his prior offer of proof. King testified that he overheard defendants talking about the victim and heard one say "[t]hey thought she was pretty." "[O]ne of them said that maybe they shouldn't have hit her so hard." "[T]hey said she was good looking" and said "something about she should have given them what they wanted." As defendants were leaving King's house, he heard one of them—he thought it was Paul—start "to say something, and Matthew sa[id], 'well, we don't have to talk about that anymore. I think we're in the clear', something to that effect." King called the police the next day to report defendants' comments, but the police took no action in response. King testified that he has severe memory problems, that "everything [wa]s all mixed up in [his] mind," that he has smoked marijuana on a daily basis for his "whole life," and that there was a "possibility that this [wa]s all part of [him] going crazy."

Both defendants elected not to testify at trial, and they were convicted as set forth above. The instant appeals ensued.

## II. STANDARDS OF REVIEW

On appeal, defendants raise numerous claims of error, thereby implicating several standards of review. "We review for an abuse of discretion a trial court's decision to admit or exclude evidence," but preliminary legal questions of admissibility are reviewed de novo, *People v Mann*, 288 Mich App 114, 117; 792 NW2d 53 (2010), including whether a statement constitutes inadmissible hearsay, *People v McDaniel*, 469 Mich 409, 412; 670 NW2d 659 (2003). Reversal of a criminal conviction on the basis of a trial court's erroneous evidentiary ruling is only necessary where the error prejudiced the defendant and resulted in a miscarriage of justice. MCL 769.26; *People v Snyder* (*After Remand*), 301 Mich App 99, 111; 835 NW2d 608 (2013). A defendant seeking reversal "has the burden of establishing that, more probably than not, a miscarriage of justice occurred because of the error." *People v Knapp*, 244 Mich App 361, 378; 624 NW2d 227 (2001). "[A] trial court's decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *People v Cameron*, 291 Mich App 599, 608; 806 NW2d 371

---

[8] *People v Matthew Wayne Jones*, unpublished order of the Court of Appeals, entered April 29, 2015 (Docket No. 327053); *People v Paul Michael Jones*, unpublished order of the Court of Appeals, entered April 29, 2015 (Docket No. 327054).

(2011) (quotation marks and citation omitted). "We review unpreserved evidentiary error, including alleged constitutional error, for plain error." *People v Coy*, 258 Mich App 1, 12; 669 NW2d 831 (2003).

We review for an abuse of discretion a trial court's "denial of a motion for a new trial on the ground that the verdict was against the great weight of the evidence," *People v McCray*, 245 Mich App 631, 637; 630 NW2d 633 (2001), denial of a motion for a mistrial, *People v Alter*, 255 Mich App 194, 205; 659 NW2d 667 (2003), and decision regarding a motion to change venue, *People v Jendrzejewski*, 455 Mich 495, 500; 566 NW2d 530 (1997). "A trial court abuses its discretion when it selects an outcome outside the range of reasonable and principled outcomes." *People v Maben*, 313 Mich App 545, 552; 884 NW2d 314 (2015).

"Whether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). "Unpreserved issues concerning ineffective assistance of counsel are reviewed for errors apparent on the record." *People v Lockett*, 295 Mich App 165, 186; 814 NW2d 295 (2012).

III. ANALYSIS

A. HEARSAY

The chief argument of both defendants on appeal is that reversal is necessary because of the erroneous admission of various "hearsay" statements at trial. We conclude that no error requiring reversal occurred.

MRE 801(c) provides, " 'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

> Under MRE 802, hearsay is not admissible unless it falls under one of the hearsay exceptions set forth in the Michigan Rules of Evidence. If, however, the proponent of the evidence offers the statement for a purpose other than to prove the truth of the matter asserted, then the statement, by definition, is not hearsay. MRE 801(c). [*People v Musser*, 494 Mich 337, 350; 835 NW2d 319 (2013).]

In pertinent part, MRE 801(d) provides,

> A statement is not hearsay if:
>
> * * *
>
> (2) Admission by party-opponent. The statement is offered against a party and is (A) the party's own statement in either the party's individual or representative capacity, or (B) a statement of which the party has manifested the party's adoption or belief in its truth[.]

Although codefendants are party opponents of the prosecution, they are not party opponents of one another. *United States v Pacchioli*, 718 F3d 1294, 1305 (CA 11, 2013), citing *United States v Gossett*, 877 F2d 901, 906 (CA 11, 1989) ("[T]he admission sought to be introduced was made by a co-defendant who is not a party opponent. The Government is the party opponent of both defendants.").[9] "A statement cannot be used as a party admission unless the party made the statement," and the burden of proving, by a preponderance of the evidence, that the statement was made by a party opponent rests with the statement's proponent. *Merrow v Bofferding*, 458 Mich 617, 633; 581 NW2d 696 (1998). See also *People v Jones*, 270 Mich App 208, 216; 714 NW2d 362 (2006) (holding that the preponderance of the evidence standard governs admissibility under MRE 801(d)(2)(E)).

### 1. KING'S TESTIMONY

Defendants challenge King's testimony that he overheard defendants—or at least one of the defendants—make the following statements: (1) "They thought she was pretty" or "good looking," (2) "[M]aybe they shouldn't have hit her so hard," (3) "[S]he should have given them what they wanted," and (4) "[W]e don't have to talk about that anymore. I think we're in the clear[.]" Defendants argue that the above statements qualify as hearsay under MRE 801(c) and, thus, that such statements should not have been admitted under MRE 801(d). We disagree.

Because the four statements above were not offered to prove the truth of the matter asserted, none of those statements qualify as hearsay under MRE 801(c). This distinction rests at the very heart of the hearsay rules. Hearsay is inadmissible not because it lacks probative value but because, when a statement is relayed by someone other than the declarant, the fact-finder has no real opportunity to gauge the truth of the matter asserted by the declarant. In other words, as set forth by the rules of evidence, a statement is only hearsay if it is offered into evidence to prove the truth of the matter asserted by the declarant. Here, the probative value of the statements at issue lies not in the truth or falsity of the matter asserted but in the fact that defendants *made* the statements. In other words, the statements were not offered to prove whether defendants actually thought the victim was attractive, whether defendants should have hit the victim with less force than they did, whether she "should have given" defendants "what they wanted," or whether one of the defendants actually believed that "they" were "in the clear." Although the statements were offered as substantive evidence of defendants' guilt, they nevertheless do not qualify as hearsay under MRE 801(c).[10] It is, as such, immaterial whether

---

[9] As explained in *Shields v Reddo*, 432 Mich 761, 785 n 30; 443 NW2d 145 (1989), MRE 801(d)(2) and the corresponding federal rule, FRE 801(d)(2), were once identical. Although this is no longer true, the language of the rules remains substantially similar. Thus, it is appropriate to consult federal precedent as persuasive authority here. See *Wilcoxon v Minnesota Mining & Mfg Co*, 235 Mich App 347, 360; 597 NW2d 250 (1999) ("Though not binding on this Court, federal precedent is generally considered highly persuasive when it addresses analogous issues.").

[10] Without any citation to authority, Matthew contends that, because the statements were admitted as "substantive evidence" against Matthew, it necessarily follows that the statements

the statements also qualify as nonhearsay under MRE 801(d)—because the statements were not hearsay under MRE 801(c), they were admissible without the need to consider alternative hearsay theories of admissibility.

## 2. WESTON'S TESTIMONY

Defendant Paul next challenges the admission of Weston's testimony regarding the statements made to Lucas (defendant Matthew's girlfriend). Paul argues that such statements were inadmissible against him under MRE 801(d). We disagree.

Weston's testimony regarding the statement made by Paul—i.e., that defendants "dropped [the victim] off a ways from her home"—was clearly admissible against Paul under MRE 801(d)(2)(A) as an admission by a party opponent. Further, the statement does not qualify as hearsay under MRE 801(c). It seems evident that the prosecution did not admit Paul's statement to prove the truth of the matter asserted (i.e., that defendants actually dropped the victim off near her home on the night of her disappearance). Hence, the pertinent issue is whether Matthew's comment about why the police might interview Weston was hearsay and, if so, whether it was admissible against Paul as an adoptive admission under MRE 801(d)(2)(B). We conclude that Matthew's statement does not qualify as hearsay under MRE 801(c). The statement was not admitted to prove what it asserted, namely, *why* the police might have wanted to interview Weston. Rather, the statement was admitted as evidence that defendants were admittedly the last people seen with the victim. Thus, the trial court did not err by admitting Weston's challenged testimony.

## 3. CLARK'S TESTIMONY

Finally, both defendants challenge the trial court's decision to admit Clark's testimony regarding admissions she heard defendants make. Regarding the first such statement, neither defendant offers a persuasive argument. Clark testified that she heard *both* "bragging" defendants say, "They had us once, they let us go, [and] we're free and clear." The prosecution did not admit that statement to prove that defendants were actually "free and clear"; therefore, the statement is not hearsay under MRE 801(c). And even if the "free and clear" statement did otherwise qualify as hearsay, it would be admissible against both defendants under MRE 801(d)(2)(A) as an admission by a party opponent.

The second statement related through Clark's testimony was also admissible against each defendant under MRE 801(d)(2), albeit under different subparts of that rule. Clark testified that she heard defendant Paul say

---

are hearsay. Matthew's argument is a non sequitur. Put in laymen's terms, Matthew's argument places the cart before the horse. As a general rule, hearsay statements cannot be admitted as substantive evidence. *People v Lundy*, 467 Mich 254, 257; 650 NW2d 332 (2002). But it does not follow from that premise that *all* substantive evidence is necessarily hearsay. On the contrary, "[a]dmissions by a party are specifically *excluded* from hearsay and, thus, are admissible as both impeachment and substantive evidence under MRE 801(d)(2)." *Id.* (emphasis added).

that they had taken her [the victim] out to a party spot. She discovered there was nobody out there, so she got out of the vehicle and started to leave. He said that they chased her with the car, hit her, [and] knocked her down with the mirror of the car. And then they got out of the vehicle and they grabbed something from behind the vehicle, a log or something, and they started to hit her with it, and they took turns having sex with her.

Because Clark testified that Paul made the above statement, it was admissible against him under MRE 801(d)(2)(A). Contrastingly, the statement was admissible against Matthew as an adoptive admission under MRE 801(d)(2)(B). Clark testified that when Paul made the statement in question, Matthew was "[r]ight next to" Paul, both defendants were acting "cocky" and "bragging," and Matthew did not dispute the truth of what Paul said in any way. Instead, Matthew nodded his head, and said "yes and uh-huh." Hence, through both his oral assertions and nonverbal conduct, Matthew manifested an adoption or belief in the truth of Paul's statements.

## B.  GREAT WEIGHT OF THE EVIDENCE

Next, defendants contend that the trial court abused its discretion by denying their respective motions for a new trial based on the great weight of the evidence. We disagree.

"A verdict is against the great weight of the evidence if the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow it to stand." *People v Reid (On Remand)*, 292 Mich App 508, 513; 810 NW2d 391 (2011). "[A]bsent exceptional circumstances, issues of witness credibility are for the jury, and the trial court may not substitute its view of the credibility 'for the constitutionally guaranteed jury determination thereof.' " *People v Lemmon*, 456 Mich 625, 642; 576 NW2d 129 (1998), quoting *Sloan v Kramer-Orloff Co*, 371 Mich 403, 411; 124 NW2d 255 (1963) (opinion of O'HARA, J.). Such "exceptional circumstances" are situations where the testimony (1) "contradicts indisputable physical facts or laws," (2) "is patently incredible or defies physical realities," (3) "is material and is so inherently implausible that it could not be believed by a reasonable juror," or (4) "has been seriously impeached" leaving the remainder of the prosecution's case "marked by uncertainties and discrepancies." *Lemmon*, 456 Mich at 643-644 (quotation marks and citations omitted). "If the evidence is nearly balanced, or is such that different minds would naturally and fairly come to different conclusions, the judge may not disturb the jury findings although his judgment might incline him the other way." *Id.* at 644 (quotation marks and citation omitted). Hence, as a general rule, "when testimony is in direct conflict and testimony supporting the verdict has been impeached, if 'it cannot be said as a matter of law that the testimony thus impeached was deprived of all probative value or that the jury could not believe it,' the credibility of witnesses is for the jury." *Id.* at 643, quoting *Anderson v Conterio*, 303 Mich 75, 79; 5 NW2d 572 (1942).

Defendants' instant claim of error hinges largely on their attack against the credibility of Robinson and Corrigan. But although the evidence adduced at trial seriously undermined the credibility of both witnesses—particularly Robinson—their testimony was not so inherently implausible that it could not be believed by a reasonable juror. And even assuming, for the sake of argument, that the jury believed that Robinson and Corrigan were completely dishonest— tailoring their testimony out of whole cloth in hopes of securing Robinson favorable treatment—

there was still sufficient evidence to support the jury's verdicts. Robinson and Corrigan were but two of dozens of prosecution witnesses. The fact that Robinson and Corrigan might have perjured themselves in this matter does not inexorably lead to the conclusion that *all* of the incriminating testimony against defendants was also perjurious.

Matthew also contends that the testimony of other witnesses, including Clark, was inherently implausible. Matthew argues that Clark was standing too far away from defendants to overhear their conversations. But Clark testified that during each conversation she was standing less than 10 yards from defendants, a mere 20 to 25 feet away. Both conversations took place outdoors, where ambient noise from partygoers would not have been confined and amplified, and defendants had been drinking on both occasions, which might well have impaired their ability to regulate the volume of their speech. Defendants presented no evidence that Clark was physically incapable of hearing spoken words from a distance of 10 yards, and given her young age during the pertinent timeframe it seems altogether plausible that she could have done so. Clark's testimony that she overheard defendants was neither patently incredible nor did it contradict indisputable physical facts.

Matthew further argues that Clark should not be believed because she did not report defendants' statements to the police promptly and because, before reporting such comments to the police, Clark had spoken with Bonnor, who related details about the investigation to Clark. But when asked by a jury-submitted question why she failed to report defendants' comments earlier, Clark responded, "I was under the assumption that the case was closed and didn't think that my statement was enough to convict anyone. I was one person with a very small child." Moreover, Tomich testified that Clark has a reputation in the community for being truthful, and Clark denied that her discussions with Bonnor were the basis of her testimony against defendants. Given such conflicting evidence, the jury was presented with a credibility determination regarding Clark's testimony; it was not testimony that no rational juror could believe. If believed, Clark's testimony, combined with the testimony about the condition of the victim's remains when they were found, was sufficient to support Matthew's first-degree murder conviction.[11]

---

[11] To the extent that defendant Matthew argues, in the alternative, that there was insufficient evidence for a rational trier of fact to find him guilty of first-degree murder, we hold that Matthew has abandoned his argument by failing to sufficiently brief its merits. This Court does not serve as a research assistant for the parties before it. See *People v Kevorkian*, 248 Mich App 373, 389; 639 NW2d 291 (2001) ("It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position. The appellant himself must first adequately prime the pump; only then does the appellate well begin to flow.") (quotation marks and citation omitted). Defendant Matthew provides almost no analysis in support of his sufficiency of the evidence argument, instead merely incorporating his argument about his conviction being against the great weight of the evidence. Indeed, citations aside, Matthew's "analysis" spans just two sentences.

Although the evidence against defendants Paul and Matthew differed slightly because certain testimony was presented to only one jury, for purposes of the instant analysis the identical conclusion is appropriate as to both defendants. Because of the lack of physical evidence linking defendants to the victim's murder, this case boiled down to witness credibility. The trial court's decision not to disturb the credibility judgments underlying the jury's verdict fell within the range of reasonable and principled outcomes.

## C. MISTRIAL

Defendant Paul argues that the trial court abused its discretion by denying his motion for a mistrial based on the introduction of evidence that Paul offered to take a polygraph test. By stipulating that the jury would be permitted to listen to the audio recording that purportedly contained the word "polygraph," however, defendant Paul waived any claim of error regarding such evidence. See *People v Gonzalez*, 256 Mich App 212, 224; 663 NW2d 499 (2003)[12] ("Because error requiring reversal cannot be error to which the aggrieved party contributed by plan or negligence, defendant has waived appellate review of this issue."). See also *People v Buie*, 491 Mich 294, 309; 817 NW2d 33 (2012) ("A defendant is free to waive objections to evidence by stipulation") (quotation marks and citation omitted); *People v Szalma*, 487 Mich 708, 726; 790 NW2d 662 (2010) ("[A] party may not harbor error at trial and then use that error as an appellate parachute[.]"). "[W]aiver extinguishes any error and precludes defendant from raising the issue on appeal." *People v Carter*, 462 Mich 206, 209; 612 NW2d 144 (2000).

## D. CHANGE OF VENUE

In his Standard 4 brief, defendant Paul argues that the trial court abused its discretion by denying his motion to change venue based on pretrial publicity and bias in the jury pool. But Paul's trial counsel waived the instant claim of error when, at the close of the jury selection process, counsel indicated that the defense was "satisfied" with the jury impaneled and failed to renew Paul's motion to change venue. See *People v Clark*, 243 Mich App 424, 426; 622 NW2d 344 (2000) ("Defense counsel's failure to renew the motion and his expression of satisfaction with the jury waived the change of venue issue."). Again, "waiver extinguishes any error and precludes defendant from raising the issue on appeal." *Carter*, 462 Mich at 209.

As an alternative argument, Paul contends that his trial counsel performed ineffectively by approving the impaneled jury and failing to renew Paul's motion to change venue. Paul's argument in this regard is unavailing.

A criminal defendant bears the burden of proving the factual predicate for a claim of ineffective assistance of counsel. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

> Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. To establish an ineffective assistance of counsel claim, a defendant must show that (1) counsel's performance was below

---

[12] Disapproval on other grounds 469 Mich 967 (2003).

an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. A defendant must also show that the result that did occur was fundamentally unfair or unreliable. [*Lockett*, 295 Mich App at 187 (citations omitted).]

The "reviewing court must not evaluate counsel's decisions with the benefit of hindsight," but should "ensure that counsel's actions provided the defendant with the modicum of representation" constitutionally required. *People v Grant*, 470 Mich 477, 485; 684 NW2d 686 (2004), citing *Strickland v Washington*, 466 US 668, 689; 104 S Ct 2052; 80 L Ed 2d 674 (1984). The decision whether to move for a change of venue is a matter of trial strategy, *People v Aspy*, 292 Mich App 36, 48; 808 NW2d 569 (2011), and "[d]efense counsel is given wide discretion in matters of trial strategy because many calculated risks may be necessary in order to win difficult cases," *People v Unger*, 278 Mich App 210, 242; 749 NW2d 272 (2008).

Here, before trial the judge below indicated that, due to the "intense publicity" surrounding the case, he was allowing the attorneys to "collaborate on a proposed questionnaire" that could be submitted to potential jurors along with their jury duty summonses. The trial judge described the purpose of the questionnaire as follows:

[B]asically the subject of it would be whether or not any of the proposed jury people had heard anything from any source or formed some decisions about this case in terms of how it should be decided. So obviously we're getting at whatever media attention or from any other source; media or otherwise.

The trial judge explained that although it was his practice to conduct the majority of jury voir dire himself, at the request of the parties he was going to provide "a little bit more latitude" for the attorneys to engage in voir dire. The voir dire process in this case lasted nearly a full day, and the trial judge asked prospective jurors whether they had any prejudice or bias regarding the case, excusing those who did for cause. At the outset, a prospective juror who had not returned the jury questionnaire enclosed with her summons was excused for cause after she revealed preexisting bias about the case.

Given all of the precautions that were taken to ensure the impartiality of the jury, Paul has failed to prove that his counsel's decision to express satisfaction with the impaneled jury was strategically unsound. Indeed, given the fact that counsel's comment approving the impaneled jury was made in the *presence* of the jurors, it seems that it was altogether prudent for counsel to express satisfaction. Moreover, Paul has failed to establish that counsel's decision not to renew the motion to change venue was strategically ineffective. There is, perhaps, no area where trial strategy is more subjective—and secretive—than in the area of jury selection. There are a number of valid reasons that Paul's counsel might, after seeing the jury his client had received, have believed that it was better strategy to remain in Newaygo County than to request a change of venue. Given the fact that defendants are lifelong residents of the area, counsel might have believed that the "hometown" jury would favor defendants. Considering intangibles such as the jurors' educational levels, professions, ages, the gender balance, and so on, counsel might have been pleased with the demographic makeup of the jury and might have believed that it was unlikely Paul would obtain a more favorable jury after a change of venue. Indeed, the fact that

Paul was convicted of second-degree murder—not first-degree murder—tends to suggest that Paul's Newaygo jury *was* somewhat favorable to the defense. In any event, Paul certainly has not carried his burden of presenting record evidence to rebut the strong presumption that his counsel's performance was both strategic and effective. Thus, the instant claim of error necessarily fails.[13]

## E. RELEVANCE

Finally, defendant Matthew argues that he was denied his right to a fair trial by the prosecution's "sandbagging" introduction of "a copious amount of irrelevant and inadmissible evidence[.]" We disagree.

Matthew did not object below to the admission of the purportedly irrelevant evidence at issue. Thus, this issue is unpreserved. See *People v Douglas*, 496 Mich 557, 574; 852 NW2d 587 (2014) (quotation marks and citation omitted).

> To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights. The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings. It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice. [*People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999) (quotation marks and citations omitted).]

"Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id.* at 763-764 (quotation marks, citations, and brackets omitted).

"All relevant evidence is admissible," and the converse is equally true: "[e]vidence which is not relevant is not admissible." MRE 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable *or less probable* than it would be without the evidence." MRE 401 (emphasis added).

Defendant Matthew's argument of this issue seems to be based on a fundamental misunderstanding of the role that our state's prosecutors serve in criminal proceedings. The tacit suggestion of Matthew's argument is that the prosecution should only deem relevant that

---

[13] Matthew also offers a perfunctory argument that his trial counsel performed ineffectively. Matthew waived that claim of error, however, by failing to include it in his statement of questions presented. See *People v Fonville*, 291 Mich App 363, 383; 804 NW2d 878 (2011) ("Fonville has not properly presented this argument to this Court because he failed to identify it as an issue in his statement of questions presented. Therefore, he has waived this issue for appellate review.") (footnote omitted). "[W]aiver extinguishes any error and precludes defendant from raising the issue on appeal." *Carter*, 462 Mich at 209.

evidence which tends to make it *more* probable that the defendant is guilty, ignoring all other evidence as irrelevant. Thus, in effect Matthew suggests that the prosecution should approach cases with partisan zeal, treating the rules of evidence as an invitation to present only evidence that will assist in securing a conviction. Matthew's argument in this regard is directly contrary to the venerable principle that a

> [prosecuting] attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. [*People v Buckey*, 424 Mich 1, 33 n 26; 378 NW2d 432 (1985) (alteration in original), quoting *Berger v United States*, 295 US 78, 88; 55 S Ct 629; 79 L Ed 1314 (1935), overruled on other grounds *Stirone v United States*, 361 US 212, 215; 80 S Ct 270; 4 L Ed 2d 252 (1960).]

It is a cornerstone principle of American jurisprudence that the prosecution is under a constant duty to reveal exculpatory evidence and to correct any false evidence of which it becomes aware. See, e.g., *People v Smith*, 498 Mich 466, 482 n 8; 870 NW2d 299 (2015).

In light of such principles, Matthew's argument is entirely unpersuasive. The vast majority of the evidence that Matthew seeks to challenge on appeal was relevant not because it was *in*culpatory but because it was potentially *ex*culpatory. Such evidence includes the testimony of the cold case team members who exhumed the victim's body, performed various forensic tests, and discovered no physical evidence linking defendants to the victim's murder. Such evidence also includes the physical evidence found in the general vicinity of the victim's remains (i.e., the table legs, the strands of hair, the lock blade pocket knife, the photo identification card, the gas card, a plastic cup, and the pairs of pants), all of which were tested without revealing any forensic evidence tying defendants to the victim's murder. Defendants' guilt or innocence was, of course, *the* fact of consequence to the determination of this case, and all of the above evidence tended to make it less probable that defendants were guilty. The evidence was not rendered any less relevant in that regard merely because it was introduced as part of the prosecution's proofs.

The remainder of the challenged evidence was relevant to provide the necessary context and background for the jury to understand what occurred during the many years between the victim's death and trial. "[I]t is essential that prosecutors and defendants be able to give the jury an intelligible presentation of the full context in which disputed events took place." *People v Sholl*, 453 Mich 730, 741; 556 NW2d 851 (1996).

Furthermore, although it is not as readily apparent, there was at least some logical relevance undergirding Judy Decan's testimony. Decan testified that she lived near the place

where others testified that the victim's remains were discovered. She further testified that some night in July 1989—Decan could not recall the date—around 2:00 a.m., she was startled out of sleep when she "heard a girl scream three times." She also heard "a couple of men . . . yelling something." It sounded as if "maybe she [the screaming girl] was being hurt or something." Decan thought that the screaming incident happened during the early morning hours of a Saturday or Sunday. Although Detective Miller opined that the victim was most likely murdered on the night that she disappeared, the forensic expert testified that the date of death could only be estimated as "sometime in July"—or possibly even August or September—of 1989. Thus, Decan's testimony had at least some relevance regarding the date of the victim's death, tending to make it more likely that the victim died sometime in July than thereafter. In any event, the introduction of such testimony was not plainly erroneous.

Because all of the evidence Matthew challenges as irrelevant bore some logical relevance to a fact of consequence to the determination of this case, the introduction of such evidence did not constitute error, let alone plain error. Thus, Matthew's instant claim of error necessarily fails.

Affirmed.

/s/ Kurtis T. Wilder
/s/ William B. Murphy
/s/ Colleen A. O'Brien